IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ANDREW CHARTIER,

*Plaintiff,*

v.

M. RICHARD EPPS, P.C., *et al.*,

*Defendants.*

Civil Action No. ELH-14-1071

**MEMORANDUM OPINION**

Andrew Chartier filed suit against M. Richard Epps, P.C. ("Epps"); Equifax Information Services, LLC ("Equifax"); TransUnion, LLC ("TransUnion");[1] Cohn, Goldberg & Deutsch, LLC ("Cohn");[2] and Green Tree Servicing, LLC ("Green Tree"), alleging violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, *et seq.* ("FDCPA") and the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"). Chartier also asserts a claim for breach of contract. *See* ECF 5 ("Amended Complaint" or "Am. Compl.").

Pursuant to Rules 12(b)(2) and 12(b)(6) of the Federal Rules of Civil Procedure, Epps filed a motion to dismiss (ECF 11), supported by a memorandum (ECF 11-1) (collectively, the "Epps Motion"), seeking dismissal of the Amended Complaint based on lack of personal jurisdiction and for failure to state a claim. Green Tree also filed a motion to dismiss (ECF 18) and a supporting memorandum (ECF 18-1) (collectively, the "Green Tree Motion"), urging dismissal pursuant to Rule 12(b)(6).[3] Chartier has opposed both motions. ECF 28 (Opposition

---

[1] Equifax and TransUnion each filed an answer to the Amended Complaint. *See* ECF 17 (TransUnion Answer); ECF 20 (Equifax Answer).

[2] Cohn filed a notice of settlement, ECF 13, and was dismissed from the suit. ECF 25.

[3] Green Tree filed a counterclaim against Chartier, ECF 24, which Chartier moved to dismiss. ECF 30. Green Tree subsequently dismissed the counterclaim, without prejudice. ECF 33.

to Green Tree Motion); ECF 29 (Opposition to Epps Motion).   Green Tree and Epps each

replied.   ECF 31 (Green Tree Reply); ECF 32 (Epps Reply).

The issues have been fully briefed, and no hearing is necessary to resolve them.   *See*

Local Rule 105.6.   For the reasons that follow, I will deny both motions.

## I. Factual Background[4]

This case arises from a dispute concerning the interpretation of a settlement agreement.

On an unspecified date, plaintiff defaulted on his obligations under a promissory note, which was

held by Green Tree as servicing agent for RBS Citizens, N.A.   *See* Am. Compl. Exh. A (ECF 5-

2).   When the debt became delinquent, Green Tree assigned it to Epps for collection.   Am.

Compl. ¶ 12.   On September 21, 2011, plaintiff entered into a Settlement Agreement and Release

with Green Tree, *see* Am. Compl. Exh. A (the "Agreement"), which was negotiated by Epps.

*See* Am. Compl. ¶ 13.

At the time of default, Chartier owed $42,273.17, with interest at an annual rate of eight

percent.   *See* Agreement at 1.   Under the Agreement, plaintiff promised to pay $21,136.00,

without interest (the "Settlement Amount"), in full satisfaction for the money owed on the

promissory note.[5]   Agreement ¶ 1.   The Agreement specified that plaintiff was to pay an initial

installment of $2,500 by September 30, 2011, and then "$18,636.00 payable in equal monthly

installments of $328.26 commencing on October 15, 2011 and continuing on the same day of

each month thereafter until September 15, 2015 at which time the last such monthly installment

---

[4] The Factual Background is largely drawn from the Amended Complaint.   At this
juncture, the court "'must accept as true all of the factual allegations contained in the
complaint,'" and must "'draw all reasonable inferences in favor of the plaintiff.'"   *E.I. du Pont
de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted).

[5] Citing paragraph 1 of the Agreement, the Amended Complaint asserts that plaintiff
agreed to pay $21,113.00 to settle the debt owed.   Am. Compl. ¶ 14.   This appears to be a
typographical error, as the Agreement indicates that the Settlement Amount is $21,136.00.

of the settlement amount shall be due and payable." *Id.* ¶ 2(b).  The Agreement stipulated that

plaintiff could pre-pay the Settlement Amount, in whole or in part, "without penalty." *Id.* ¶ 4;

Am. Compl. ¶ 15.  In addition, the Agreement provided: "[S]o long as the installment payments

provided herein are received as provided herein the Lender will take no legal action to collect the

promissory note." *Id.* ¶ 1.  With respect to default, Epps was appointed as agent of Chartier to,

"without further notice to Borrower, confess judgment on behalf of the Borrower for the unpaid

balance . . . ." *Id.* ¶ 6.  The Agreement also stated, *id.*:

> In the event of a default in the making of any installment payment of the
> settlement amount, and if such installment is not received by Green Tree
> Servicing LLC within 10 days of its due date, at Lender's option, this Settlement
> Agreement and Release shall be null and void and in such event all payments
> made pursuant to this Agreement prior to the default shall be applied to the
> indebtedness and Borrower shall remain liable for the remaining balance of the
> indebtedness, which said sum shall be immediately due and payable without
> further notice to Borrower.

By the end of July 2013, plaintiff had paid the initial installment of $2,500.00 and made

forty-eight payments of $328.26.  *See* Am. Compl. Exh. B (email dated July 29, 2013, 3:43 p.m.,

from Mr. Epps[6] to Chartier).  Almost two years after execution of the Agreement, on July 29,

2013, Mr. Epps sent an email to plaintiff, stating that there was a typographical error in the

Agreement and the monthly installment amount should have read $388.26 instead of $328.26—a

difference of $60.00 per month.  Am. Compl. Exh. B.  Mr. Epps acknowledged the receipt from

Chartier of forty-eight payments of $328.26 each, plus the initial installment, but advised

plaintiff that these payments only totaled $18,256.48.  *Id.*  In addition, Mr. Epps asserted that

---

[6] When discussing Richard Epps, the individual, I will use "Mr. Epps," to distinguish
such references from those pertaining to the entity M. Richard Epps, P.C. (which, as indicated, is
referred to as "Epps").  Mr. Epps is not a defendant.

plaintiff still owed a remaining balance of $2,869.52[7] pursuant to the Agreement.  *Id.*; Am. Compl. ¶ 17.

Plaintiff appended to the Amended Complaint a truncated version of a series of emails exchanged prior to the settlement between Mr. Epps and Justin M. Jacks, Esq., plaintiff's attorney at the time he entered into the Agreement.  Am. Compl. Exh. B (email of July 29, 2013, from Mr. Epps to Chartier); *see also* Green Tree Mot. Exh. 1.[8]  In an email dated September 19, 2011, Jacks wrote to Mr. Epps:  "Mr. Chartier would like to know what he needs to sign to get this agreement done on the $2500.00 down and payments in 48 month [sic] installments of $388.26."  Green Tree Mot. Exh. 1 (email of September 19, 2011, from Jacks to Mr. Epps).  *See also* Am. Compl. Exh. B (email of July 29, 2013, from Mr. Epps to Chartier, containing text of the prior email of September 19, 2011).

On February 9, 2014, Chartier wrote an email to Mr. Epps to advise him of his current Maryland address.  Am. Compl. Exh. B (email of February 9, 2014, from Chartier to Mr. Epps). Chartier stated: "I have no ties to Virginia or the Virginia Beach address. Please ensure all communication comes to me at this address."  *Id.*  On February 10, 2014, Mr. Epps responded to Chartier's email as follows: "Please advise if you intend to pay the remaining due under the settlement.  If so fine.  If not I will advise my client to send the file to its Maryland attorney.  My

---

[7] Mr. Epps asserted in his email to plaintiff of July 29, 2013, that the total amount due under the Agreement was $21,126.00.  Based on this figure, Mr. Epps insisted that plaintiff still owed $2,869.52 after paying $2,500 and forty-eight installments of $328.26.  Notably, the Agreement specifies a Settlement Amount of $21,136.00, which would leave a balance of $2,8*7*9.52, rather than $2,8*6*9.52, after payment of $2,500.00 plus forty-eight installments of $328.26.

In the same email of July 29, 2013, Mr. Epps also stated: "The monthly payment should have been $388.36.  $388.04 x 48 = $18,625.92 . . . ."  It is not clear why Mr. Epps cited the amount of $388.04.

[8] As discussed, *infra*, attached to the Green Tree Motion is the original email exchange between Mr. Epps and Jacks.

recommendation will be to pursue the entire balance remaining due, not just what remains of the settlement." Am. Compl. Exh. B (email of February 10, 2014 from Mr. Epps to Chartier).  Below this message, the email advised: "THE UNDERSIGNED IS A DEBT COLLECTOR.  THIS IS AN ATTEMPT TO COLLECT A DEBT.  ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE." *Id.* (emphasis in original).  At some point thereafter, Epps forwarded the account to Cohn to collect a debt in the amount of $25,001.46. *Id.* ¶ 20.

Plaintiff also alleges that, in or around December 2013, he became aware that Green Tree was reporting the debt to one or more of the three national consumer reporting agencies. *Id.* ¶ 22.  On or about January 11, 2014, plaintiff sent a letter to Equifax and TransUnion, asserting that the debt had been paid in full pursuant to a settlement with Green Tree. *Id.* ¶ 23. Nevertheless, plaintiff asserts, Equifax and TransUnion continued to report the debt as having a current balance due and payable. *Id.* ¶ 24.

## II.  Standards of Review

### A.  Fed. R. Civ. P. 12(b)(2)

A motion to dismiss for lack of personal jurisdiction arises under Fed. R. Civ. P. 12(b)(2). "When a court's personal jurisdiction is properly challenged by a Rule 12(b)(2) motion, the jurisdictional question thus raised is one for the judge, with the burden on the plaintiff ultimately to prove the existence of a ground for jurisdiction by a preponderance of the evidence." *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989).  Discovery and an evidentiary hearing are not required to resolve a motion under Rule 12(b)(2). *See generally* 5B Wright & Miller, Federal Practice & Procedure § 1351, at 274–313 (3d ed. 2004, 2012 Supp.).  Rather, the district court may address the question of personal jurisdiction as a preliminary matter, ruling solely on the basis of motion papers, supporting legal memoranda, affidavits, and the allegations in the

complaint.  *Consulting Engineers Corp. v. Geometric Ltd.*, 561 F.3d 273, 276 (4th Cir. 2009).  In

that circumstance, a plaintiff need only make "a prima facie showing of a sufficient jurisdictional

basis to survive the jurisdictional challenge."  *Id.*

"In deciding whether the plaintiff has made the requisite showing, the court must take all

disputed facts and reasonable inferences in favor of the plaintiff."  *Carefirst of Maryland, Inc. v.*

*Carefirst Pregnancy Centers, Inc.*, 334 F.3d 390, 396 (4th Cir. 2003).  However, "'[a] threshold

*prima facie* finding that personal jurisdiction is proper does not finally settle the issue; plaintiff

must eventually prove the existence of personal jurisdiction by a preponderance of the evidence,

either at trial or at a pretrial evidentiary hearing.'"  *New Wellington Fin. Corp. v. Flagship Resort*

*Dev. Corp.*, 416 F.3d 290, 294 n.5 (4th Cir. 2005) (citation omitted).[9]

## B.  Fed. R. Civ. P. 12(b)(6)

A defendant may test the adequacy of a complaint by way of a motion to dismiss under

Rule 12(b)(6) of the Federal Rules of Civil Procedure.  *See McBurney v. Cuccinelli*, 616 F.3d

393, 408 (4th Cir. 2010).  To survive a Rule 12(b)(6) motion, a complaint must satisfy the

pleading standard articulated in Fed. R. Civ. P. 8(a)(2), which requires a "short and plain

statement of the claim showing that the pleader is entitled to relief."  The purpose of the rule is to

provide the defendant with "fair notice" of the claim and the "grounds" for entitlement to relief.

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 & n.3 (2007).  That showing must consist of

more than "a formulaic recitation of the elements of a cause of action" or "naked assertion[s]

devoid of further factual enhancement."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal

---

[9] Alternatively, the court may, in its discretion, permit limited discovery as to the jurisdictional issue.  *See Mylan Laboratories, Inc. v. Akzo, N.V.*, 2 F.3d 56, 64 (4th Cir. 1993).  Then, "the court may resolve the [jurisdictional] challenge on the basis of a separate evidentiary hearing, or may defer ruling pending receipt at trial of evidence relevant to the jurisdictional question."  *Combs*, 886 F.2d at 676.  In this case, no party has requested discovery as to jurisdiction.

citations omitted); *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). Rather, to defeat a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Iqbal*, 556 U.S. at 684 ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . .") (citation omitted); *see also Epps v. JP Morgan Chase Bank, N.A.*, 675 F.3d 315, 320 (4th Cir. 2012); *Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754, 768 (4th Cir. 2011). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

In considering a Rule 12(b)(6) motion, the court '"must accept as true all of the factual allegations contained in the complaint,'" and must '"draw all reasonable inferences [from those facts] in favor of the plaintiff.'" *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted); *see, e.g.*, *Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir. 2011), *cert. denied*, ___ U.S. ___, 132 S. Ct. 402 (2011). But, the court need not accept unsupported or conclusory factual allegations devoid of any reference to actual events. *United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979); *see also Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009). Nor must it accept legal conclusions couched as factual allegations, *Iqbal*, 556 U.S. at 678, or legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Monroe v. City of Charlottesville*, 579 F.3d 380, 385-86 (4th Cir. 2009), *cert. denied*, 559 U.S. 992 (2010). If the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint has not shown that '"the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (citation omitted).

"Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "A court decides whether this standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to relief. *A Society Without A Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011), *cert. denied*, ___ U.S. ___, 132 S. Ct. 1960 (2012). Dismissal "is inappropriate unless, accepting as true the well-pled facts in the complaint and viewing them in the light most favorable to the plaintiff, the plaintiff is unable to 'state a claim to relief . . . .'" *Brockington v. Boykins*, 637 F.3d 503, 505-06 (4th Cir. 2011) (citation omitted). *See Hartmann v. Calif. Dept. of Corr. & Rehab.*, 707 F.3d 1114, 1122 (9th Cir. 2013) ("'Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory.'") (citation omitted); *Commonwealth Prop. Advocates, LLC v. Mortg. Elec. Reg. Sys., Inc.*, 680 F.3d 1194, 1201-02 (10th Cir. 2011) ("When reviewing a 12(b)(6) dismissal, 'we must determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed.' Dismissal is appropriate if the law simply affords no relief.") (citation omitted).

Ordinarily, in resolving a motion under Rule 12(b)(6), a court "is not to consider matters outside the pleadings . . . ." *Bosiger v. U.S. Airways, Inc.*, 510 F.3d 442, 450 (4th Cir. 2007); *see Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013). If a court considers material outside of the pleadings, "the motion must be treated as one for summary judgment under Rule 56," in which case "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). Under certain limited

exceptions, however, a court may consider exhibits without converting the motion to one for summary judgment.  For instance, a court may properly consider documents "attached to the complaint, as well those attached to the motion to dismiss, so long as they are integral to the complaint and authentic."  *Philips v. Pitt Cnty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (citations omitted); *see Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004).  To be "integral," a document must be one "that by its 'very existence, *and not the mere information it contains*, gives rise to the legal rights asserted.'"  *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (citation omitted) (emphasis in original).  Further, in resolving a motion to dismiss, a court may consider "documents which are referred to in the Complaint and upon which Plaintiff relies in bringing the action."  *Biospherics, Inc. v. Forbes, Inc.*, 989 F. Supp. 748, 749-50 (D. Md. 1997), *aff'd*, 151 F.3d 180 (4th Cir. 1998); *accord Mid-Atlantic Soaring Ass'n, Inc. v. F.A.A.*, 2006 WL 1892412, at *7 (D. Md. June 29, 2006).  Additionally, facts and documents subject to judicial notice may be considered by a court, without converting the motion under Rule 12(d).  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 466 (4th Cir.), *cert. denied*, ___ U.S. ___, 132 S. Ct. 115 (2011).

Plaintiff has attached two exhibits to his Amended Complaint: (1) the Agreement (Am. Compl. Exh. A, ECF 5-2); and (2) a chain of three emails between Chartier and Mr. Epps (Am. Compl. Exh. B, ECF 5-3).  Notably, Epps attached the same chain of emails as an exhibit to its motion.  *See* Epps Motion Exh. 1 (ECF 11-1).  Green Tree and Epps raise no objections to any exhibit attached to the Amended Complaint.  Because the exhibits are integral to the Amended Complaint and no party disputes their authenticity, I may consider them in connection with the

motions under a Rule 12(b)(6) standard.  *See Anand*, 754 F.3d at 198; *Philips*, 572 F.3d at 180; *Am. Chiropractic Ass'n*, 367 F.3d at 234.

In addition, Green Tree and Epps attached to their motions a chain of three emails exchanged between Mr. Epps and Jacks.  *See* Green Tree Motion Exh. 1 (ECF 18-2); Epps Motion Exhs. 1(a), (b), and (c) (ECF 11-2).  The email of July 29, 2013, from Mr. Epps to Chartier, which is attached as Exhibit B to plaintiff's Amended Complaint, references these three emails and incorporates their content.  In his oppositions to the motions, plaintiff raises no objection to the exhibits attached by Green Tree and Epps.  Because these emails are referenced in the Amended Complaint, and because plaintiff has relied upon them in bringing suit, I may consider them under a Rule 12(b)(6) standard.  *See Biospherics, Inc.*, 989 F. Supp. at 749-50; *Mid-Atlantic Soaring Ass'n, Inc.*, 2006 WL 1892412, at *7.

### III.  Discussion

### A.  Dismissal Under Fed. R. Civ. P. 12(b)(2) for Lack of Personal Jurisdiction

Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure authorizes a federal district court to exercise personal jurisdiction over a defendant in accordance with the law of the state where the district court is located.  *Carefirst*, *supra,* 334 F.3d at 396.  Therefore, "to assert personal jurisdiction over a nonresident defendant, two conditions must be satisfied: (1) the exercise of jurisdiction must be authorized under the state's long-arm statute; and (2) the exercise of jurisdiction must comport with the due process requirements of the Fourteenth Amendment."  *Id.*

Maryland's long-arm statute is codified at Md. Code (2013 Repl. Vol., 2013 Supp.), § 6-103(b) of the Courts & Judicial Proceedings Article.  It authorizes "personal jurisdiction over a person, who directly or by an agent":

> (1) Transacts any business or performs any character of work or service in the State;

(2) Contracts to supply goods, food, services, or manufactured products in the State;

(3) Causes tortious injury in the State by an act or omission in the State;

(4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from goods, food, services, or manufactured products used or consumed in the State;

(5) Has an interest in, uses, or possesses real property in the State; or

(6) Contracts to insure or act as surety for, or on, any person, property, risk, contract, obligation, or agreement located, executed, or to be performed within the State at the time the contract is made, unless the parties otherwise provide in writing.

*Id*.

Maryland's courts have "consistently held that the purview of [Maryland's] long arm statute is coextensive with the limits of personal jurisdiction set by the due process clause of the Federal Constitution." *Beyond Systems, Inc. v. Realtime Gaming Holding Co.*, 388 Md. 1, 15, 878 A.2d 567, 576 (2005) (citing *Mohamed v. Michael*, 279 Md. 653, 657, 370 A.2d 551, 553 (1977)). "Because the limits of Maryland's statutory authorization for the exercise of personal jurisdiction are coterminous with the limits of the Due Process Clause, the statutory inquiry necessarily merges with the constitutional inquiry, and the two inquiries essentially become one." *Stover v. O'Connell Assocs., Inc.*, 84 F.3d 132, 135-36 (4th Cir. 1996); *accord ALS Scan, Inc. v. Digital Service Consultants, Inc.*, 293 F.3d 707, 710 (4th Cir. 2002). Thus, the question is whether the exercise of personal jurisdiction offends the due process guarantee of the Fourteenth Amendment.

The United States Supreme Court has long held that personal jurisdiction over a nonresident defendant is constitutionally permissible so long as the defendant has "minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). Due process jurisprudence recognizes "two types of personal jurisdiction:

general and specific." *CFA Institute v. Institute of Chartered Financial Analysts of India*, 551

F.3d 285, 292 n.15 (4th Cir. 2009). The difference between the two turns on the amount and

nature of the contacts with the forum state that are necessary to meet the "minimum contacts"

threshold. The Fourth Circuit has explained:

> General personal jurisdiction, on the one hand, requires 'continuous and
> systematic' contacts with the forum state, such that a defendant may be sued in
> that state for any reason, regardless of where the relevant conduct occurred.
> Specific personal jurisdiction, on the other hand, requires only that the relevant
> conduct have such a connection with the forum state that it is fair for the
> defendant to defend itself in that state.

*Id.* (citing, *inter alia*, *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414-15

(1984)) (internal citations omitted).

Plaintiff does not assert that general jurisdiction exists over Epps in this case. *See* ECF

29. The Fourth Circuit has set forth a three-part inquiry for determining whether the due process

requirements for asserting specific jurisdiction have been met. In particular, a court considers:

"(1) the extent to which the defendant has purposefully availed itself of the privilege of

conducting activities in the state; (2) whether the plaintiffs' claims arise out of those activities

directed at the state; and (3) whether the exercise of personal jurisdiction would be

constitutionally 'reasonable.'" *Consulting Engineers*, *supra*, 561 F.3d at 278 (citing *ALS Scan*,

293 F.3d at 715). *See also Carefirst*, 334 F.3d at 397.

"The first prong articulates the minimum contacts requirement of constitutional due

process that the defendant purposefully avail himself of the privilege of conducting business

under the laws of the forum state." *Consulting Engineers*, 561 F.3d at 278. "Th[e] 'purposeful

availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a

result of 'random,' 'fortuitous,' or 'attenuated' contacts, or of the 'unilateral activity of another

party or a third person.'" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (internal

citations omitted); *see also ESAB Grp., Inc. v. Zurich Ins. PLC*, 685 F.3d 376, 392 (4th Cir. 2012).

To satisfy the second prong of the test for specific jurisdiction, a defendant's contacts with the forum state must form the basis of the suit. *Consulting Engineers*, 561 F.3d at 278-79. The constitutional reasonableness inquiry permits a defendant "who purposefully has directed his activities at forum residents" to defeat jurisdiction, if he can "present a compelling case that the presence of some other considerations would render jurisdiction unconstitutional." *Burger King*, 471 U.S. at 477. "This prong of the analysis ensures that litigation is not so gravely difficult and inconvenient as to place the defendant at a severe disadvantage in comparison to his opponent." *Tire Eng'g & Distribution, LLC v. Shandong Linglong Rubber Co., Ltd.*, 682 F.3d 292, 303 (4th Cir. 2012) (citing *CFA Inst.*, 551 F.3d at 296) (internal quotation marks omitted), *cert. denied*, ___ U.S. ___, 133 S. Ct. 846 (2013).

The Supreme Court expounded on the minimum contacts requirement in *Burger King*, 471 U.S. 462. There, the Court explained that minimum contacts are those that involve "significant activities within a State" or "'continuing obligations' between [the defendant] and residents of the forum." *Id.* at 475-76 (citations omitted). The benchmark is "'foreseeability . . . that the defendant's conduct and connections with the forum state are such that he should reasonably anticipate being hauled into court there.'" *Id.* at 474 (*quoting World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295 (1980)).

In the context of a contractual relationship, the *Burger King* Court stated unequivocally that entering into a contract with a citizen of the forum state "*alone*" cannot "automatically establish minimum contacts" over a nonresident defendant. 471 U.S. at 478 (emphasis in original). But, the Court was equally clear that "even a single act can support jurisdiction," so

- 13 -

long as that act "creates a 'substantial connection' with the forum." *Id.* at 475 n.18 (citation omitted). Likewise, in *Carefirst*, 334 F.3d at 397, the Fourth Circuit said: "Even a single contact may be sufficient to create jurisdiction when the cause of action arises out of that single contact, provided that the principle of 'fair play and substantial justice' is not thereby offended." *See also, e.g.*, *Planet Technologies, Inc. v. Planit Technology Group, LLC*, 735 F. Supp. 2d 397, 401 (D. Md. 2010); *Cole-Tuve, Inc. v. American Machine Tools Corp.*, 342 F. Supp. 2d 362, 366 (D. Md. 2004); *Nichols v. G.D. Searle & Co.*, 783 F. Supp. 233, 238 (D. Md. 1992), *aff'd*, 991 F.2d 1195 (4th Cir. 1993).

Further, the *Burger King* Court stated: "Although territorial presence frequently will enhance a potential defendant's affiliation with a State and reinforce the reasonable foreseeability of suit there," jurisdiction cannot be "avoided merely because the defendant did not *physically* enter the forum State." 471 U.S. at 476 (emphasis in original). Of import here, the *Burger King* Court observed that "it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted."[10] *Id.*

The Supreme Court explained, *id.* at 479 (internal citations omitted):

[A] "contract" is ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction." It is these factors—prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing—that must be evaluated in determining whether the defendant purposefully established minimum contacts with the forum.

---

[10] As the parties' email correspondence shows, that observation is all the more true in the internet age.

In *Consulting Engineers*, 561 F.3d at 278, the Fourth Circuit enumerated several "nonexclusive factors," applicable in the "business context," that might help to "resolve whether a defendant has engaged in . . . purposeful availment." The factors include, *inter alia*:

- whether the defendant reached into the forum state to solicit or initiate business;

- whether the defendant deliberately engaged in significant or long-term business activities in the forum state;

- whether the parties contractually agreed that the law of the forum state would govern disputes;

- whether the defendant made in-person contact with the resident of the forum in the forum state regarding the business relationship;

- the nature, quality and extent of the parties' communications about the business being transacted; and

- whether the performance of contractual duties was to occur within the forum[.]

*Id*. (internal citations omitted). The *Consulting Engineers* Court cautioned, however, that these factors are "not susceptible of mechanical application." *Id*.

Epps has submitted an affidavit in which Mr. Epps avers that neither he nor M. Richard Epps, P.C. conducts any business in the state of Maryland, derives an income from business conducted in Maryland, or owns any real property in the state of Maryland. Epps Motion Exh. 2 (ECF 11-3, Affidavit). According to Mr. Epps, the Agreement was executed in Virginia Beach, Virginia, and plaintiff was a resident of Virginia Beach, Virginia at the time. *Id.* ¶¶ 9-10.

To support his position that specific jurisdiction over Epps exists, plaintiff points to the February 2014 email exchange between Mr. Epps and plaintiff. ECF 29 at 11 (citing Am. Compl. Exh. B). According to plaintiff, Epps purposefully availed itself of the privilege of conducting activities in Maryland through Mr. Epps's email, sent in an attempt to collect a debt

from plaintiff, who Mr. Epps knew to be a Maryland resident. *Id.* And, because Mr. Epps's email of February 10, 2014, is one of the communications forming the basis of plaintiff's FDCPA claim, plaintiff insists that personal jurisdiction is proper because the suit arises out of activities directed at Maryland. *Id.* at 11-12.

Although plaintiff's jurisdictional allegations are primarily founded on the email of February 10, 2014, Epps argues that it did not purposefully avail itself of the privilege of conducting activities in Maryland or purposefully direct activities toward Maryland by way of the email of July 29, 2013. ECF 32 at 3. Because Epps was not notified of plaintiff's Maryland residency until February 9, 2014, Epps insists that it did not purposefully avail itself of the privilege of conducting activities in Maryland or purposefully direct activities toward Maryland by way of any communications with plaintiff prior to that date. *Id.*; *see* ECF 11-1.

Epps also challenges plaintiff's assertion that Mr. Epps's email to plaintiff on February 10, 2014, is sufficient to establish specific jurisdiction.[11] ECF 32 at 4. According to Epps, the email of February 10, 2014, demonstrates that Epps would not pursue the debt or claim in Maryland, and this lone email should not be construed as an attempt to purposefully avail itself of the privilege of conducting business in Maryland. *Id.* at 4-5. With respect to the email of February 10, 2014, Epps does not appear to dispute that plaintiff's claim against it arises out of activities directed at Maryland.

In my view, Epps purposefully availed itself of the privilege of conducting activities in the forum by directing debt collection activities at a Maryland resident. Epps's contention that the email of February 10, 2014, merely indicated that Mr. Epps would be transferring collection

---

[11] In its Reply, Epps states that Mr. Epps emailed plaintiff on February 9, 2014. However, the exhibits reflect that Mr. Epps emailed plaintiff on February 10, 2014, in response to an email that plaintiff wrote on February 9, 2014, notifying Epps that he resided in Maryland. The discrepancy is not material for the purposes of this Motion.

responsibilities to a Maryland attorney, *see* ECF 32 at 4, is a mischaracterization of its content. Rather, in the email, Mr. Epps asked Chartier to advise whether he intended to pay the debt that purportedly remained due under the Agreement. *See* Am. Compl. Exh. B (email of February 10, 2014 from Richard Epps to Chartier). Further, Mr. Epps threatened that, in the event Chartier did not pay the debt, he would recommend that Green Tree pursue recovery of the entire amount remaining due under the loan, rather than the smaller sum that purportedly remained due pursuant the Agreement. *See id.* Notably, the email specifically stated: "THE UNDERSIGNED IS A DEBT COLLECTOR. THIS IS AN ATTEMPT TO COLLECT A DEBT. ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE." *Id.* (emphasis in original). Moreover, the email suggests that it was Mr. Epps's advice that compelled Green Tree thereafter to attempt to collect the entire amount remaining due under the loan, rather than the amount that purportedly remained pursuant the Agreement.

Regarding personal jurisdiction in the context of FDCPA claims, in *Sluys v. Hand*, 831 F. Supp. 321, 324 (S.D.N.Y. 1993), the court said:

> Where an alleged debtor is located in a jurisdiction and receives documents from a person purporting to be a debt collector located elsewhere, and the transmittal of those documents is claimed to have violated the [FDCPA], suits may be brought where the debtor . . . receive[s] the communications. Otherwise, one could invoke the protection of distance and send violative letters with relative impunity, at least so far as less well-funded parties are concerned.

Notably, *Sluys* involved a single letter, copies of which were sent from defendant, an Indiana attorney, to the plaintiff and his employer, both located in New York. 831 F. Supp. at 323. Other courts addressing personal jurisdiction and FDCPA claims have reached similar conclusions in cases involving only a single communication. *See, e.g.*, *Silva v. Jason Head, PLC*, 2010 WL 4593704, at *3 (N.D. Cal. Nov. 4, 2010) (personal jurisdiction existed as to nonresident attorney/debt collector based on single voicemail that gave rise to FDCPA claim);

- 17 -

*Maloon v. Schwartz, Zweban & Slingbaum, L.L.P.*, 399 F. Supp. 2d 1108, 1112-13 (D. Haw. 2005) (personal jurisdiction existed where defendant debt collector's only contact with the forum was a single debt collection letter); *Paradise v. Robinson and Hoover*, 883 F. Supp. 521, 524-26 (D. Nev. 1995) (concluding that plaintiff made *prima facie* showing of personal jurisdiction as to Oklahoma law firm based on plaintiff's alleged receipt in Nevada, the forum state, of a single debt collection letter sent by the defendant law firm).

Epps emphasizes that the email of February 10, 2014, was the only communication that Epps sent after learning that Chartier resided in Maryland. ECF 32 at 4. However, in considering whether to exercise jurisdiction over a defendant, a court must focus on the quality, not merely the quantity, of the contacts. *See Carefirst*, 334 F.3d at 397. In this case, I am persuaded that Epps's actions created the sort of connection to this forum "such that he should reasonably anticipate being haled into court [here] . . . ." *World–Wide Volkswagen*, 444 U.S. at 297.

With respect to the second prong of the analysis, plaintiff's claims against Epps arise in substantial part from its forum-related activities. This is because the email of February 10, 2014, is one of the communications upon which plaintiff's FDCPA claims are predicated.

Having found that Epps's conduct amounted to "purposefully direct[ing]" its activities at a resident of Maryland, the forum state, and that plaintiff's claim "arises out of or relates to" Epps's activities within the forum, I must next address the third prong of the analysis, *i.e.*, whether the assertion of specific personal jurisdiction over defendant would be constitutionally reasonable. The following factors are relevant to the consideration of reasonableness:

> (1) the burden on the defendant of litigating in the forum; (2) the interest of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the shared interest of the states in obtaining

efficient resolution of disputes; and (5) the interests of the states in furthering substantive social policies.

*Consulting Engineers*, 561 F.3d at 279 (citing *Burger King*, 471 U.S. at 477). "These considerations sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required." *Burger King*, 471 U.S. at 477.

Here, the burden of litigating in Maryland is minimal because of Epps's location in neighboring Virginia. As to the interest of the forum state, "[a] State generally has a 'manifest interest' in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors." *Burger King*, 471 U.S. at 474. Moreover, Chartier's interest in obtaining convenient and effective relief would be readily achieved by litigating the dispute in this forum, as he lives in Maryland and several of the other defendants in the action have submitted to jurisdiction here. The fact that the other defendants have submitted to jurisdiction in Maryland also serves the states' shared interest in obtaining efficient resolution of dispute, in light of the piecemeal litigation that would result if plaintiff's claims against Epps were severed. On balance, these factors weigh heavily in favor of a Maryland forum for resolution of plaintiff's claims against Epps.

Because I am satisfied that plaintiff has made the requisite *prima facie* showing of personal jurisdiction over Epps, the motion to dismiss for lack of personal jurisdiction will be denied, without prejudice.

## B. Dismissal Under Fed. R. Civ. P. 12(b)(6) for Failure to State a Claim

In essence, this dispute turns on the interpretation of a contract that, in plaintiff's view, required him to pay an initial installment of $2,500.00, and then $328.26 for forty-eight months thereafter. Green Tree and Epps, in contrast, contend that the Agreement clearly contained a typographical error and, consistent with the parties' actual intent, it should have provided for a

monthly installment amount of $388.26.   Green Tree and Epps insist that plaintiff still owed nearly $2,900 after paying the initial installment and then forty-eight installments of $328.26. Moreover, they claim that plaintiff defaulted on his payments under the Agreement by refusing to pay that amount, and thus he now owes the full balance remaining under the promissory note.

Asserting that he fulfilled his obligations under the Agreement after tendering forty-eight payments of $328.26, plaintiff alleges that Green Tree violated the FCRA by reporting to consumer reporting agencies that the debt had a current balance that was due and payable.  *See* Am. Compl. ¶¶ 22-24.  Plaintiff also lodges a claim for breach of contract, arguing that Green Tree breached the terms of the Agreement "by attempting to collect an additional amount from Plaintiff and by failing to update his credit report to reflect the Debt had been paid." *Id.* ¶ 48.  As to Epps, plaintiff contends that it violated various provisions of the FDCPA by attempting to collect a debt that plaintiff did not owe.  *See id.* ¶ 34; ECF 29 at 14.

As a preliminary matter, there is a question of what law applies to the contractual dispute. A federal court sitting in diversity must apply the law of the state in which the court is located, including the forum state's choice-of-law rules, unless a compelling federal interest directs otherwise.  *Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d 270, 275 (4th Cir. 2007); *Baker v. Antwerpen Motorcars, Ltd.*, 807 F. Supp. 2d 386, 389 n.13 (D. Md. 2011).  As to contract claims, Maryland applies the law of the state in which the contract was formed ("*lex loci contractus*"), unless the parties to the contract agreed to be bound by the law of another state. *See, e.g.*, *Am. Motorists Ins. Co. v. ARTRA Group, Inc.*, 338 Md. 560, 573, 659 A.2d 1295, 1301 (1995); *TIG Ins. Co. v. Monongahela Power Co.*, 209 Md. App. 146, 161, 58 A.3d 497, 507 (2012).  A contract is formed where the last act necessary to make it binding occurs.  *Konover Prop. Trust Inc. v. WHE Assocs.*, 142 Md. App. 476, 490, 790 A.2d 720, 728 (2002).

At this stage in the litigation, it is unclear whether Maryland or Virginia law governs. The Amended Complaint does not contain allegations regarding the location of the Agreement's formation, and the Agreement does not contain a choice-of-law provision.  Moreover, the parties take no definitive position on choice of law in their briefing.  Epps applies Maryland law to the contractual issues without discussion.  Green Tree and Chartier recognize that either Maryland or Virginia law would apply to the contractual dispute, and analyze plaintiff's claims under the law of both states.

"Choice-of-law analysis becomes necessary, however, only if the relevant laws of the different states lead to different outcomes." *Lowry's Reports, Inc. v. Legg Mason, Inc.*, 271 F. Supp. 2d 737, 750 (D. Md. 2003).  Where the laws "do not so conflict, the choice is immaterial, and the law of the forum—Maryland—governs." *Id.*  Here, the parties have not identified any relevant legal principles in Maryland or Virginia that differ.  Indeed, in applying both Maryland and Virginia law, Green Tree and plaintiff posit that the result would be the same.  *See* ECF 28; ECF 29; ECF 31.

At this juncture, I will defer resolving the choice of law issue until after the parties have engaged in discovery.  Rather, for the purposes of defendants' motions, I will apply Maryland law in resolving the parties' contract-based disputes.  *See Ohio Sav. Bank v. Progressive Cas. Ins. Co.*, 521 F.3d 960, 962 (8th Cir. 2008) ("Like the district court, we will ignore what might be a complex choice of law analysis because the parties have not identified a relevant state law conflict."); *Cleaning Auth., Inc. v. Nubert*, 739 F. Supp. 2d 807, 820 (D. Md. 2010) ("'Choice-of-law analysis becomes necessary . . . only if the relevant laws of the different states lead to different outcomes.'") (citation omitted).

"Maryland adheres to the principle of the objective interpretation of contracts." *Cochran v. Norkunas*, 398 Md. 1, 16, 919 A.2d 700, 709 (2007).   Under Maryland law, "interpretation of a contract, including the determination of whether a contract is ambiguous, is a question of law . . . ." *Sy-Lene of Wash., Inc. v. Starwood Urban Retail II, LLC*, 376 Md. 157, 163, 829 A.2d 540, 544 (2003); *see also Myers v. Kayhoe*, 391 Md. 188, 198, 892 A.2d 520, 526 (2006); *Towson Univ. v. Conte*, 384 Md. 68, 78, 862 A.2d 941, 946 (2004); *Lema v. Bank of Am., N.A.*, 375 Md. 625, 641, 826 A.2d 504, 513 (2003).

In Maryland, "'[t]he cardinal rule of contract interpretation is to give effect to the parties' intentions.'" *Dumbarton Imp. Ass'n Inc. v. Druid Ridge Cemetery Co.*, 434 Md. 37, 51, 73 A.3d 224, 232 (2013) (citation omitted). *See Middlebrook Tech, LLC v. Moore*, 157 Md. App. 40, 66, 849 A.2d 63, 79 (2004) ("The principal goal in the interpretation of contracts is to effectuate the intention of the parties.").   To determine the parties' intentions, courts first look to the written language of the contract. *Sy-Lene of Washington*, 376 Md. at 166, 829 A.2d at 546. *See Walton v. Mariner Health of Maryland, Inc.*, 391 Md. 643, 660, 894 A.2d 584, 594 (2006) ("Generally, when seeking to interpret the meaning of a contract our search is limited to the four corners of the agreement.").   "'The words employed in the contract are to be given their ordinary and usual meaning, in light of the context within which they are employed.'" *DIRECTV, Inc. v. Mattingly*, 376 Md. 302, 313, 829 A.2d 626, 632-33 (2003) (citation omitted).   And, "where the language employed in a contract is unambiguous, a court shall give effect to its plain meaning and there is no need for further construction by the court." *Id.* at 312, 829 A.2d at 630.

When a contract's language is clear and unambiguous, "its construction is for the court to determine." *Wells v. Chevy Chase Bank, F.S.B.*, 363 Md. 232, 251, 768 A.2d 620, 630 (2001). In construing a contract, a court must consider "what a reasonable person in the same position

would have understood as the meaning of the agreement." *Walton*, 391 Md. at 660, 894 A.2d at 594; *see Hartford Acc. & Indem. Co. v. Scarlett Harbor Assoc. Ltd. P'ship,* 109 Md. App. 217, 291, 674 A.2d 106, 142 (1996) ("[T]he court must, as its first step, determine from the language of the agreement what a reasonable person in the position of the parties would have meant at the time the agreement was effectuated."), *aff'd*, 346 Md. 122, 695 A.2d 153 (1997).  A court will presume that the parties meant what they stated in an unambiguous contract, without regard to what the parties to the contract personally thought it meant or intended it to mean.  *See Dumbarton*, 434 Md. at 51, 73 A.3d at 232; *Dennis v. Fire & Police Employees Ret. Sys.*, 390 Md. 639, 656, 890 A.2d 737, 747 (2006); *PaineWebber Inc. v. East*, 363 Md. 408, 414, 768 A.2d 1029, 1032 (2001).  *See also, e.g., Scarlett Harbor*, 109 Md. App. at 291, 674 A.2d at 142 ("Where the language of a contract is clear, there is no room for construction; it must be presumed that the parties meant what they expressed.").

Moreover, a court will not "add or delete words to achieve a meaning not otherwise evident from a fair reading of the language used." *Brensel v. Winchester Constr. Co.*, 392 Md. 601, 624, 898 A.2d 472, 485 (2006).  Indeed, "[i]t is a fundamental principle of contract law that it is 'improper for the court to rewrite the terms of a contract, or draw a new contract for the parties, when the terms thereof are clear and unambiguous, simply to avoid hardships.'" *Calomiris v. Woods*, 353 Md. 425, 445, 727 A.2d 358, 368 (1999) (*quoting Canaras v. Lift Truck Servs.*, 272 Md. 337, 350, 322 A.2d 866, 873 (1974)); *see Loudin Ins. Agency, Inc. v. Aetna Cas. & Sur. Co.*, 966 F.2d 1443 (Table), 1992 WL 145269, at *5 (4th Cir. 1992) (per curiam) ("[A] court will not rewrite the parties' contract simply because one party is no longer satisfied with the bargain he struck.").

A "contract is ambiguous if it is subject to more than one interpretation when read by a reasonably prudent person." *Sy-Lene of Washington*, 376 Md. at 167, 829 A.2d at 547; *see Cochran*, 398 Md. at 17, 919 A.2d at 710; *Auction & Estate Representatives, Inc. v. Ashton*, 354 Md. 333, 340, 731 A.2d 441, 444-45 (1999); *Calomiris*, 353 Md. at 436, 727 A.2d at 363. To determine whether a contract is ambiguous, a court considers "the character of the contract, its purpose, and the facts and circumstances of the parties at the time" that they enter into the contract. *Pacific Indem. Co. v. Interstate Fire & Cas. Co.*, 302 Md. 383, 388, 488 A.2d 486, 488 (1985).

Of import here, in the context of a motion to dismiss, the construction of an ambiguous contract "'is a question of fact which, if disputed, is not susceptible of resolution under a motion to dismiss for failure to state a claim.'" *Horlick v. Capital Women's Care, LLC*, 896 F. Supp. 2d 378, 394 (D. Md. 2011) (applying Maryland contract law) (*quoting Wolman v. Tose*, 467 F.2d 29, 34 (4th Cir. 1972)). *See also Martin Marietta Corp. v. Int'l Telecomm. Satellite Org.*, 991 F.2d 94, 98 (4th Cir. 1992) (applying Maryland contract law and reversing trial court's grant of a motion to dismiss because the contract in issue was "not free of ambiguity"); *Hardwire LLC v. Goodyear Tire & Rubber Co.*, 360 F. Supp.2d 728, 736 (D. Md. 2005) (applying Ohio contract law and noting that "an ambiguous contract provision is a factual determination that precludes dismissal on a motion for failure to state a claim.").

At an appropriate time, a court may "consider any extrinsic evidence which sheds light on the intentions of the parties at the time of the execution of the contract." *Cnty. Commissioners of Charles Cnty. V. St. Charles Associates Ltd. P'ship*, 366 Md. 426, 445, 784 A.2d 545, 556 (2001); *accord John L. Mattingly Const. Co., Inc. v. Harford Underwriters Ins. Co.*, 415 Md. 313, 327, 999 A.2d 1066, 1074 (2010). And, "if ambiguity is determined to remain

*after* consideration of extrinsic evidence, 'it will ordinarily be resolved against the party who drafted the contract.'" *Clendenin Bros., Inc. v. U.S. Fire Ins. Co.*, 390 Md. 449, 459-60, 889 A.2d 387, 394 (2006) (quoting *Collier v. MD-Individual Practice Association, Inc.*, 327 Md. 1, 6, 607 A.2d 537, 539 (1992)) (emphasis added; further citations omitted). In the context of summary judgment, if "extrinsic evidence . . . leaves genuine issues of fact respecting the contract's proper interpretation, summary judgment must . . . be refused and interpretation left to the trier of fact.'" *Basile Baumann Prost Cole & Assocs., Inc. v. BBP & Assocs. LLC*, 875 F. Supp. 2d 511, 526 (D. Md. 2012) (*quoting Washington Metro. Area Transit. Auth. v. Potomac Inv. Props., Inc.*, 476 F.3d 231, 234 (4th Cir. 2007)).

 With this framework in mind, I turn to the provisions of the Agreement. It states, in pertinent part:

1. Lender Agrees to accept the sum of $21136.00 (the "settlement amount") in full satisfaction of all monies on said promissory note.

2. The settlement amount shall be paid <u>without interest</u> as follows:

    a. an initial installment of $2500.00 due September 30, 2011;
    b. $18636.00 payable in equal monthly installments of $328.26 commencing on October 15, 2011 and continuing on the same day of each month thereafter until September 15, 2015 at which time the last such monthly installment of the settlement amount shall be due and payable.

Agreement at 2 (emphasis in original).

 It is clear that the Agreement contains a typographical or mathematical error. The total settlement amount set forth in ¶ 1 is incongruent with the amount of the "initial installment" and the monthly payments recited in ¶¶ 2(a) and 2(b) of the Agreement. In particular, a monthly payment of $328.26 for forty-eight months would total $15,756.48—not the $18,636.00 set forth in ¶ 2(b).

As indicated, Epps and Green Tree insist that the Agreement should have provided for a monthly installment of $388.26.  *See, e.g.*, ECF 11-1 at 7; ECF 18-1 at 2, 9.  However, to pay $18,636.00—the sum identified in the Agreement—spread out over forty-eight equal monthly installments, would require monthly payments of $388.25.  That sum differs from the $328.26 recited in ¶ 2(b) of the Agreement.  Moreover, it also differs (if only by one cent) from the sum—$388.26—that both Epps and Green Tree insist should have appeared in the Agreement.  *See, e.g.*, ECF 11-1 at 7; ECF 18-1 at 2, 9.  In any event, what cannot be definitively ascertained, based on the four corners of the contract, is where that error lies.  Accordingly, the error renders the Agreement facially ambiguous as to the amount plaintiff was required to pay in order to fulfill his obligations under the contract.

The parties devote significant energy to arguing that the Court should consider extrinsic evidence in the event that the Agreement contains an ambiguity.  Green Tree and Epps, on the one hand, urge the Court to consider the parties' negotiations leading up to the Agreement as evidenced by the email exchange between Mr. Epps and Jacks.  Plaintiff, on the other hand, asserts that defendants' course of performance is informative of the parties' intent for the monthly payments to be in the amount of $328.26.  Further, plaintiff maintains that ambiguities should be construed against the drafter.

It may be that extrinsic evidence will clearly establish the proper interpretation of the Agreement.  However, as noted above, the construction of an ambiguous contract provision is not susceptible to resolution on a motion to dismiss for failure to state a claim.

Plaintiff also advances the argument that Green Tree waived any right to payment of $21,136.00 by accepting forty-eight payments of $328.26 without objection.  Yet, "whether subsequent conduct of the parties amounts to a modification or waiver of their contract is

generally a question of fact to be decided by the trier of fact." *University Nat'l Bank v. Wolfe*, 279 Md. 512, 523, 369 A.2d 570, 576 (1977); *see also Hovnanian Land Inv. Grp., LLC v. Annapolis Towne Ctr. at Parole, LLC*, 421 Md. 94, 122, 25 A.3d 967, 983 (2011); *BarGale Indus., Inc. v. Robert Realty Co., Inc.*, 275 Md. 638, 644, 343 A.2d 529, 533 (1975).[12]

In light of the ambiguity in the Agreement and surrounding factual issues, I decline to dismiss plaintiff's claims against Epps and Green Tree.

### IV.  Conclusion

For the foregoing reasons, the motions of Epps and Green Tree are denied.  A separate Order follows, consistent with this Memorandum Opinion.


Date:  September 23, 2014          _____/s/_____
                                  Ellen Lipton Hollander
                                  United States District Judge

---

[12] No party has sought reformation of the Agreement, nor has any party otherwise raised an argument invoking the principles of "unilateral mistake" or "mutual mistake."  Regarding a unilateral mistake, Maryland law "is clear that, absent intentional, culpable conduct, such as fraud, duress or undue influence, a unilateral mistake is ordinarily not a ground for relief from a contract." *Creamer v. Helferstay*, 294 Md. 107, 121, 448 A.2d 332, 339 (1982).  *See Meeks v. Dashiell*, 166 Md. App. 415, 442, 890 A.2d 779, 795 (2006); *see also, e.g.*, *Larocca v. Creig Northrop Team, P.C.*, 217 Md. App. 536, 552, 94 A.3d 197, 206 (2014).

As for a mutual mistake, a party seeking reformation of a contract bears the burden of establishing that "(1) the contract as written should not be enforced, either because of a mutual mistake, or duress or inequitable conduct, and (2) 'there is clear, convincing and satisfying proof of a mutual understanding and bargain that has not been accurately expressed.'" *Jaguar Land Rover North America, LLC v. Manhattan Imported Cars, LLC*, 2010 WL 3609531, at *8 (D. Md. Sept. 14, 2010) (quoting *City of Baltimore v. De Luca–Davis Constr. Co.*, 210 Md. 518, 524, 124 A.2d 557, 560 (1956)).  In any event, because the parties raise no such arguments, I need not further address these principles.