IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| ANDREW CHARTIER, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No.: 1:14-cv-01071-ELH |
| M. RICHARD EPPS P.C., *et al*, | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OF LAW IN SUPPORT OF
## GREEN TREE SERVICING, LLC'S MOTION FOR SUMMARY JUDGMENT

Defendant Green Tree Servicing, LLC n/k/a Ditech Financial, LLC ("Green Tree"), by and through its undersigned counsel, submits this memorandum of law in support of its motion for summary judgment on Counts II and III of Plaintiff Andrew Chartier's First Amended Complaint[1] (cited as "FAC"). The undisputed material facts establish that Plaintiff's claims against Green Tree for violation of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et seq.*, and breach of contract fail as a matter of law.

## INTRODUCTION

This case arises from a typographical error in a settlement agreement between Plaintiff and Green Tree (as the servicing agent for RBS Citizens, N.A.). Seeking to take advantage of the error, Plaintiff initiated this action alleging that Green Tree violated the FCRA by reporting to consumer reporting agencies that the underlying debt remained outstanding and had a balance that was due and payable. FAC, ¶¶ 22-24. Plaintiff also claims that Green Tree breached the terms of the settlement agreement "by attempting to collect an additional amount from Plaintiff and by failing to update his

---

[1] Count I of the First Amended Complaint is directed only at co-defendant M. Richard Epps, P.C.

credit report to reflect the Debt had been paid." *Id.*, ¶ 48.  Both of these claims rise and fall on whether Plaintiff satisfied the terms of the settlement with Green Tree.

The undisputed material facts establish that Plaintiff has paid only $18,256.48 towards the settlement, notwithstanding his agreement to pay fifty percent (50%) of the outstanding debt or $21,136.00.  Plaintiff admits that he has paid less than the settlement amount, but seeks refuge in a scrivener's error on the face of the agreement.  As this Court previously recognized, "[t]he total settlement amount [of $21,136] set forth in ¶ 1 [of the settlement agreement] is incongruent with the amount of the 'initial installment' and the monthly payments recited in ¶¶ 2(a) and 2(b) of the Agreement."  Doc. 36, Memorandum Opinion at 25.  As a result of the incongruity, this Court found the settlement agreement "facially ambiguous as to the amount plaintiff was required to pay in order to fulfill his obligations under the contract." *Id.* at 26.  While this ambiguity could not be resolved on the allegations of the First Amended Complaint, the undisputed, material facts show a mutual mistake in the amount of the monthly installment payments due under the agreement.  The agreement should have reflected forty-eight (48) monthly payments of $3**88**.26 rather than $3**2**8.26.  The reference to $328.26 is simply a typographical error and is inconsistent with the negotiations that preceded the settlement and conflicts with other undisputed terms of the agreement.  Inasmuch as this error is the result of a mutual mistake, the Court is permitted to reform the settlement agreement to reflect the true intentions of the parties.  Doing so here requires the entry of summary judgment in favor of Green Tree and against Plaintiff.  Otherwise, Plaintiff would enjoy a savings windfall, and Green Tree (on behalf of RBS) would forfeit the recovery it was promised and incur potential liability that was never anticipated by the parties.

## STATEMENT OF UNDISPUTED, MATERIAL FACTS

### A. The Underlying Debt.

On November 29, 2006, Plaintiff obtained two mortgage loans in connection with his purchase of certain real property located at 7085 Nova Drive, Unit 304 in Fort Lauderdale, Florida (the "Property"). Deposition of Andrew Chartier ("Chartier Depo.") at 38:18-39:20, attached as Exhibit 1. The first mortgage loan was from Bank of America, N.A., and the second mortgage loan was from National City Bank in the principal amount of $48,400.00. *Id.* at 39:21-40:2; 41:2-8. The second mortgage loan was subsequently sold by National City Bank and assigned to RBS Citizens, N.A ("RBS"), which engaged Green Tree to service the loan on its behalf. *Id.* at 44:21-45:4.

There came a time in 2009 or 2010 when Plaintiff could no longer afford to pay either the first or the second mortgage loan. Ex. 1, Chartier Depo. at 45:8-21. After missing multiple payments on both loans and facing possible foreclosure, Plaintiff sold the Property for $95,000.00 in a short sale. *Id.* at 50:13-51:9, 51:19-53:5, 58:14-19. Because Plaintiff owed more than that amount on the loans, he had to obtain both Bank of America's and RBS's consent to the short sale. *Id.* at 58:20-59:6; 59:14-59:22. On behalf of RBS, Green Tree was willing to agree to the short sale and release the second mortgage on the Property in consideration of (i) the payment of $4,795.00, and (ii) Plaintiff's continued obligation to pay the remaining amount due under the loan. *Id.* at 63:3-6, and Letter from Green Tree to Plaintiff dated January 27, 2011, attached as Exhibit 2. Plaintiff accepted these terms, the short sale of the Property closed, and Green Tree filed a "Partial Release of Mortgage" in the land records of Lee County, Florida. Ex. 1, Chartier Depo. at 63:10-14, and Partial Release of Mortgage, attached as Exhibit 3.[2] The release expressly states that its sole purpose is to release the Property from the lien created by the mortgage and

---

[2] The Court may take judicial notice of matters of public record, such as land records. *Philips v. Pitt Cnty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

that Plaintiff's obligation under the loan remains unaffected as the loan has not been fully paid.  Ex. 3, Partial Release of Mortgage.

**B.      Collection of the Debt.**

Notwithstanding Green Tree's cooperation with the short sale, Plaintiff decided that because he no longer owned the Property, there was no need for him to continue to make monthly payments. Indeed, from the date of the short sale of the Property in January or February 2011 through the date of the settlement agreement in this case, Plaintiff did not make a single payment.  Ex. 1, Chartier Depo. at 66:15-67:6.  As a result, Plaintiff owed RBS a principal balance of $42,273.17 as of August 17, 2011. *Id.* at 65:9-21; 72:7-17, and Settlement Agreement dated September 21, 2011, attached as Exhibit 4.

Not having heard from Plaintiff or received any payment on the loan, Green Tree, on behalf of RBS, engaged M. Richard Epps, P.C. to pursue collection efforts.  Deposition of M. Richard Epps, Esquire ("Epps Depo.") at 22:22-23:2, attached as Exhibit 5.  By letter dated August 17, 2011, Mr. Epps wrote to Plaintiff advising that the loan has been accelerated and, as a result, the principal balance due was $42,273.17.  *Id.* at 87:19-25; Deposition of Justin Jacks ("Jacks Depo.") at 23:7-24:8, and Letter from M. Richard Epps, P.C. to Plaintiff dated August 17, 2011, attached as Exhibits 6 and 7, respectively.  Thereafter, Plaintiff offered $2,500 in full settlement.  Ex. 6, Jacks Depo. at 21:10-18, and Letter from M. Richard Epps, P.C. to Plaintiff dated August 29, 2011, attached as Exhibit 8.  Mr. Epps responded to the offer in writing and advised Plaintiff that Green Tree rejects his offer but is willing to settle the debt for 50% of the balanced owed ($42,273.17 x 50% = $21,136.00) on the following terms: "$2,500 as a down payment and remaining balance in 48 monthly payments of $388.26."  *Id.*

Plaintiff was not willing to accept Green Tree's offer at this time so he called Mr. Epps in early September 2011 and countered with an offer of $7,000.  Ex. 5, Epps Depo. at 88:1-19.  Plaintiff advised Mr. Epps that if the matter did not settle, he was going to consult an attorney.  *Id.* at 89:9-23.

Thereafter, on September 14, 2011, Plaintiff engaged attorney Justin Jacks, Esquire to continue the settlement negotiations on his behalf. Ex. 6, Jacks Depo. at 16:7-17:17.  To this end, Plaintiff signed an "Authorization for Release of Information" authorizing "RBS and any of its representatives . . . to negotiate with [his] attorney, Justin M. Jacks . . . as if they were negotiating with [him] personally." Authorization for Release of Information attached as Exhibit 9, and Ex. 6, Jacks Depo. at 25:8-26:23. Based on this authorization, Mr. Jacks began negotiating with Mr. Epps on an exclusive basis, and Mr. Epps had no further direct settlement negotiations with Plaintiff.  Ex. 6, Jacks Depo. at 26:24-27:3, 54:22-55:2, and Ex. 5, Epps Depo. at 89:2-8; 90:18-91:12; 96:10-20.

**C.    Negotiations Leading To Settlement Agreement.**

Other than an initial phone call, most of the negotiations between Mr. Jacks and Mr. Epps took place by email. Ex. 5, Epps Depo. at 89:9-90:17; Ex. 6, Jacks Depo. at 28:7-14.  While Mr. Jacks made modest counter-offers during the course of the negotiations. Mr. Epps remained steadfast that Green Tree would not accept anything less than 50% of the principal balance owed (or $21,136.00 [$42,273.17 x 50%]) unless Plaintiff is willing to submit a packet of information and documents demonstrating financial hardship. Ex. 5, Epps Depo. at 89:9-90:17; Ex. 6, Jacks Depo. at 30:11-31:17, 32:12-17, 33:7-21, 55:13-17, and emails from Mr. Epps to Mr. Jacks dated September 14, 2011, attached as Exhibits 10 and 11.  After sharing Green Tree's position with Plaintiff, Mr. Jacks sent Mr. Epps an email on September 15, 2011, advising that Plaintiff "in no way wants to provide [Green Tree] those documents" and inquired whether "there is really no amount less than 50% that [Green Tree] will offer to settle this." Email from Mr. Jacks to Mr. Epps dated September 15, 2011 at 4:01, attached as Exhibit 12, and Ex. 6, Jacks Depo. at 32:12-17.  Mr. Epps responded, stating that "Green Tree stands firm. I assume the servicing agreement allows them to settle for 50% but anything less must be substantiated/supported/justified…It looks like $21k would do the trick."  *Id.,* email from Mr. Epps to

5

Mr. Jacks dated September 15, 2011 at 16:34.  Plaintiff testified that he too understood that Green Tree would not settle for less than 50% of the outstanding debt. Ex. 1, Chartier Depo. at 90:13-16.

The next exchange between Mr. Jacks and Mr. Epps occurred on September 19, 2011.  Mr. Jacks sent an email stating that "Plaintiff would like to know what he needs to sign to get this agreement done on the $2,500 down and payments in 48 month installments of $388.26."[3]  Ex. 6, Jacks Depo. at 35:21-37:1, and email from Mr. Jacks to Mr. Epps dated September 19, 2011 at 11:17, attached as Exhibit 13. Mr. Jacks testified that prior to sending the email, Plaintiff agreed to settle the debt by making an initial payment of $2,500 and forty-eight (48) monthly installment payments of $388.26.  Ex. 6, Jacks Depo. at 37:2-38:17; 48:3-8.  Mr. Jacks further testified that he never would have sent the email to Mr. Epps accepting the settlement terms without Plaintiff's permission and authorization. *Id.* at 60:5-62:11.

After receiving Mr. Jacks' email advising of Plaintiff's acceptance of the settlement terms, Mr. Epps prepared the settlement agreement and sent it to Mr. Jacks by email.  Ex. 5, Epps Depo. at 90:10-17, and Ex. 13, email from Mr. Epps to Mr. Jacks dated September 19, 2011 at 17:05.  In that email, Mr. Epps wrote "I have attached a settlement agreement that sets forth those terms."  *Id.*  "[T]hose terms" refer to the payment terms of $2,500 down and forty-eight (48) monthly installments of $388.26 that Mr. Jacks wrote in his email sent earlier that day.  Ex. 13, email exchange between Mr. Epps and Mr. Jacks dated September 19, 2011.  Apparently, Mr. Jacks was unable to open the electronic version of the settlement agreement attached to Mr. Epps' email and by the time he saw the settlement agreement for the first time, it had already been signed by Plaintiff.  Ex. 6, Jacks Depo. at 39:13-44:22.  Plaintiff went to Mr. Epps' office on September 21, 2011, picked up the settlement agreement, and returned later the

---

[3] Notably, the settlement terms ultimately accepted by Plaintiff on September 19, 2011 are the same as those initially offered by Mr. Epps on August 29, 2011.  *Compare* Ex. 13, email from Mr. Jacks to Mr. Epps dated September 19, 2011 at 11:17, *with* Ex. 8, Letter from M. Richard Epps, P.C. to Plaintiff dated August 29, 2011.

same day with the signed agreement.  *Id.* at 44:12-15; Ex. 6, Epps Depo. at 91:13-25; Ex. 1, Chartier

Depo. at 75:15-76:3.  Green Tree also signed the settlement agreement on September 21, 2011, but it is

unclear whether the agreement was signed in Ohio or Arizona.  Deposition of Peter Dalpiaz ("Dalpiaz

Depo.") at 119:15-120:17, attached as Exhibit 14, and Ex. 4, Settlement Agreement.  No changes were

made to the agreement between the time Mr. Epps drafted it and the time it was signed.  Ex. 1, Chartier

Depo. at 81:15-18, Ex. 5, Epps Depo. at 95:25-96:3, Ex. 6, Jacks Depo. at 39:13-44:22, 63:15-19.

**D.**     **The Settlement Agreement.**

To draft the settlement agreement, Mr. Epps used a template that required him to manually

populate certain fields of information, including the total settlement amount, the initial payment amount,

the monthly payment amount, and the due dates for the payments.  Ex. 6, Epps Depo. at 26:21-27:8,

86:5-87:13.  Mr. Epps inputted the amounts and dates into the appropriate fields and generated the

settlement agreement.  *Id.* at 29:13-15.

The settlement agreement provides that Green Tree, as the agent for RBS, "agreed to accept a

reduced sum in full satisfaction of the said promissory note and [Plaintiff] agreed to pay that reduced

sum" in the amount of $21,136.00.  Ex. 4, Settlement Agreement.  The settlement agreement continues:

> 1.     Lender Agrees to accept the sum of $21136.00 (the "settlement amount") in full
> satisfaction of all monies on the said promissory note.
>
> 2.     The settlement amount shall be paid <u>without interest</u> as follows:
>        a.     an initial installment of $2500.00 due September 30, 2011;
>        b.     $18636.00 payable in equal monthly installments of
> $328.26 commencing on October 15, 2011 and continuing on the same day of each month
> thereafter until September 15, 2015 at which time the last such monthly installment of the
> settlement amount shall be due and payable.

*Id.*

When paragraphs 1 and 2 are read together, it is clear that "the Agreement contains a typographical or mathematical error."[4]  Doc. 36, Memorandum Opinion at 25.  The deposition testimony in this case and the email exchanges reflecting the negotiations that led up to the settlement confirm that the "error lies" in the monthly payment amount.  *Id.* at 26.  Both Mr. Epps and Mr. Jacks testified unequivocally that the reference in the settlement agreement to the monthly installment amount of $328.26 is a typographical error and that the installment amount should have been $388.26.  Ex. 5, Epps Depo. at 93:14-94:11, 95:8-24, and Ex. 6, Jacks Depo. at 13:10-18, 14:22-15:13, 37:2-7, 38:13-17.  When questioned on this issue during his deposition, Mr. Epps testified as follows:

> Q.  You testified that you negotiated the settlement with Mr. Jacks once he started representing Plaintiff.  Does the settlement agreement that's marked as Exhibit 2 [Exhibit 4 to this memorandum] accurately reflect the substance and results of those negotiations?

> A.  No.

> Q.  What is inconsistent with the settlement agreement from your negotiations and the result of those negotiations with Mr. Jacks?

> A.  The amount of the monthly payment is inaccurate.

> Q.  The amount should have been $388.26, instead of $328.26?

> A.  Correct.

> Q.  Any other inaccuracies or mistakes in the settlement agreement?

> A.  That's the only one I'm aware of.  Mr. Jacks sent me an email [Ex. 12], and in his email he recited correctly the repayment terms.

---

[4] As drafted, the total amount of payments due under the settlement would equal $18,256.48 (initial payment of $2,500 + 48 payments of $328.26), which is $2,879.52 short of the defined "settlement amount" of $21,136.00.  Whereas, if the monthly installments were in the amount of $388.26, the total amount of payments would equal $18,636.48, which is the amount reflected in paragraph 2(b) of the settlement agreement (albeit $.48 more) and which, when added to the initial payment of $2,500, equals the settlement amount of $21,136.00.

> And subsequent to that, that same day, later that day, I prepared the settlement agreement, and that's when I made the typo.

Ex. 5, Epps Depo. at 93:14-94:11.  Mr. Jacks similarly testified:

> Q.    If you go down to paragraph two B of that [settlement] agreement, it states that $18,636.00 payable in equal monthly installments of $328.26 commencing on October 15, 2011.   Is it your understanding that that is different than what you negotiated with Mr. Epps?
>
> A.    Based on the emails that I reviewed between me and Mr. Epps, that amount on the monthly installment would be different, yes . . . . I know that the installment amount looks different than what we previously negotiated between us.
>
> Q.    It's your recollection it should have been 388?
>
> A.    Yes, that is correct.

Ex. 6, Jacks Depo. at 14:22-15:13.  The corporate representative of Green Tree likewise testified that he understood that the settlement discussions were always about monthly installments in the amount of $388.26, which were necessary for the payments to equal the settlement amount of $21,136.00.  Ex. 14, Dalpiaz Depo. at 115:22-116:1.

The negotiations reflected in the email exchanges between Mr. Epps and Mr. Jacks between September 14, 2011 and the drafting of the settlement agreement on September 19, 2011 are entirely consistent with the deposition testimony in this case.  These emails show that the total amount of the settlement was always $21,136.00 and that the amount of the monthly installment payments was always $388.26.  Exs. 10-13.

**E.    Plaintiff Has Failed To Pay The Settlement Amount.**

Plaintiff admits that he has not paid $21,136.00 under the settlement agreement.  Ex. 1, Chartier Depo. at 87:8-12.  Rather, Plaintiff made the initial payment of $2,500 and thereafter made forty-eight (48) payments of $328.26, submitting the last seventeen payments by separate checks all on July 29, 2013.  Ex. 1, Chartier Depo. at 92:15-18, 170:3-172:15.  Simple arithmetic shows that Plaintiff's

payments add up to only $18,256.48, which is $2,879.52 less than the "settlement amount" he agreed to pay.[5]  Ex. 1, 87:8-12, 92:20-93:20.

## ARGUMENT

**A.  Standard of Review.**

Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure.  It provides, in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986).  As the Advisory Committee's notes to Federal Rule of Civil Procedure 56 observe, "the very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  Fed. R. Civ. P. 56 Advisory Committee's Note (1963 amends.).

When a party has submitted sufficient evidence to support its request for summary judgment, the burden shifts to the nonmoving party to show that there are genuine issues of material fact.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-88 (1986).  A party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of [its] pleadings," but rather must "set forth specific facts" showing that there is a triable issue.  *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003), *cert. denied*, 541 U.S. 1042 (2004).  The "judge's function" in reviewing a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," there is a dispute of material fact that

---

[5] *See* fn. 4, *supra.*

10

precludes summary judgment. *Id.* at 248.   In contrast, a court must award summary judgment if the evidence "is so one-sided that one party must prevail as a matter of law." *Id.* at 252. And, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

**B. Plaintiff Was Required To Pay \$21,136.00 Under The Terms Of The Settlement And Plaintiff's Admitted Failure To Pay This Amount Entitles Green Tree To Summary Judgment On The Claims Asserted In The First Amended Complaint.**

**1. Virginia Contract Law Applies To The Interpretation Of The Settlement Agreement.**

A federal court sitting in diversity must apply the law of the state in which the court is located, including the forum state's choice of law rules, unless a compelling federal interest requires otherwise. *Colgan Air, Inc. v. Ratheon Aircraft Co.*, 507 F.3d 270, 275 (4th Cir. 2007); *McGowens v. Bank of Am.*, No. ELH-14-1101, 2015 U.S. Dist. LEXIS 30586, *19 (D. Md. Mar. 12, 2015).   In a contract claim, Maryland follows the rule of *lex loci contractus*, applying the substantive law of the state where the contract was formed, unless there is a choice-of-law provision in the contract. *Am. Motorists Ins. Co. v. ARTRA Group, Inc.*, 338 Md. 560, 573, 659 A.2d 1295, 1301 (1995).   A contract is formed where the last act necessary to make it binding occurred. *Konover Prop. Trust, Inc. v. WHE Assocs., Inc.*, 142 Md. App. 476, 490, 790 A.2d 720, 728 (2002); *Bochenski v. M&T Bank*, No. ELH-14-1031, 2015 U.S. Dist. LEXIS 28976, *45 (D. Md. Mar. 10, 2015).

Because the settlement agreement in this case does not contain a choice of law provision, the rule of *lex loci contractus* will dictate the applicable substantive law.   Based on the evidence, Plaintiff signed the settlement agreement in Virginia and made all of his payments under the settlement in Virginia. Ex. 1, Chartier Depo. at 75:15-76:3, 92:15-18, 170:3-172:15. Green Tree signed the settlement agreement in

either Ohio or Arizona and returned the signed agreement to Mr. Epps in Virginia.[6]  Ex. 14, Dalpiaz

Depo. at 119:15-120:17.  Under these facts, Virginia contract law should control.

### 2. Both A Mutual Mistake Based On A Scrivener's Error And An Ambiguity In A Contract Permits This Court To Consider Extrinsic Evidence To Reform The Contract To Reflect The Parties' True Intent.

#### a. Mutual Mistake Based On A Scrivener's Error.

Virginia courts determine whether a mutual mistake of fact existed at the time of the agreement

by inquiring "whether each party held *the same mistaken belief with respect to a material fact* at the time

the agreement was executed." *Collins v. Dept. of Alcoholic Bev. Control*, 21 Va. App. 671, 681, 467

S.E.2d 279, 283 (1996) (emphasis added) (finding that both parties proceeded under the mistaken belief

that an average weekly wage set forth in Workers' Compensation Commission award was correct, when

it was not).  To reform a contract on the ground of mutual mistake, the mistake may be corrected by

parol evidence. *French v. Chapman*, 88 Va. 317, 322, 13 S.E. 479, 481 (1891).  The evidence of the

mistake must be clear and satisfactory, leaving but little, if any, doubt of the mistake.  *Norfolk v.

Bennett*, 205 Va. 877, 880, 140 S.E.2d 655, 657 (1965) (citations omitted).  "One of the tools available

to a court of equity is the equitable remedy of reformation, which provides relief against a [mutual]

mistake of fact in a written instrument . . . where both parties sign an instrument mistakenly believing it

reflects their antecedent bargain." *Hughes v. Hughes*, Record No. 1745-00-1, 2001 Va. App. LEXIS

348, at *6 (Va. Ct. App. June 19, 2001) (reforming contract upon evidence of a mutual mistake of fact).

A mutual mistake can exist as a result of a scrivener's error.  It is well established under Virginia

law that a court may correct a scrivener's error in order to reform a contract that contains a

typographical or clerical error resulting in mutual mistake. *See, e.g., White v. Campbell*, 80 Va. 180,

---

[6] The evidence shows that both Mr. Charier and Green Tree signed the settlement agreement on September 21, 2011, but the order in which the parties signed the agreement is unknown.

12

189 (1885) ("There can be no question of the power and duty of a court of equity to correct and reform a contract or written instrument, for the proved or admitted mistake of the draftsman, between living parties, and for a valuable consideration."); *Chamberlaine v. Marsh's Adm'r*, 20 Va. 283, 287 (1819) ("Reformation is making a decree, in equity, that a deed or other agreement shall be made or construed as it was originally intended by the parties, when an error or mistake as to fact has been committed by the parties."). A scrivener's error is that which is "demonstrably contradicted by all other documents," such as a typographical mistake made by a court reporter in a trial transcript, counsel's failure to prepare an order for entry by the court, and a misstatement by a judge on the record regarding the length of incarceration for a convicted defendant. *Westgate at Williamsburg Condo. Ass'n v. Philip Richardson Co.*, 270 Va. 566, 575, 621 S.E.2d 114, 119 (2005). A scrivener's error tends "to occur singularly" and is not "continuous, ongoing, and repeated." *Id.* The court may reform a contract in this context as an exception to the general rule that it otherwise may not rewrite a document or add new contract terms because scrivener's errors "are difficult to prevent, and . . . no useful social purpose is served by enforcing . . . mistaken terms." *Id.* at 575, 621 S.E.2d at 118.

### b. Ambiguity In Contract.

Under Virginia law, a contract is ambiguous when it can reasonably be understood in more than one way or when it refers to two or more things at the same time. *Vilseck v. Vilseck*, 45 Va. App. 581, 588, 612 S.E.2d 746, 749 (2005) (finding a marital separation agreement ambiguous because the term "separate property" could mean all property separately acquired and titled during marriage *and* before marriage, and remanding for consideration of extrinsic evidence). The question of whether a contract is ambiguous is one of law. *Tuomala v. Regent Univ.*, 252 Va. 368, 374, 477 S.E.2d 501, 505 (1996). "When the language of a contract is ambiguous, parol evidence is admissible, not to contradict or vary terms, but to establish the real contract between the parties. *Id.* Indeed, "if an ambiguity exists, a court

should still enforce the contract if the real meaning of the ambiguous provision can be discerned from extrinsic evidence." *Vilseck*, 45 Va. App. at 588, 612 S.E.2d at 749.

3. **Extrinsic Evidence Shows That The Parties Agreed To Settle The Underlying Debt In Consideration Of Payment In The Amount Of $21,136.00, And It Is Undisputed That Plaintiff Did Not And Has Not Paid This Amount.**

It is undisputed that Green Tree and Plaintiff agreed to settle the underlying debt in exchange for the payment of $21,136.00. Not only does the settlement agreement define the settlement amount to be $21,136.00, but also the deposition testimony of the attorneys who negotiated the agreement (Ex. 5, Epps Depo. at 89:9-90:17; Ex. 6, Jacks Depo. at 30:11-31:17, 32:12-17, 33:7-21, 55:13-17) and the emails reflecting those negotiations (Exs. 10-13) conclusively establish that Plaintiff agreed to pay $21,136.00 "in full satisfaction of all monies owed under the promissory note." Ex. 4, Settlement Agreement. It is equally undisputed that Plaintiff did not and has not paid $21,136.00. Ex. 1, Chartier Depo. at 87:8-12. Rather, Plaintiff has paid only $18,256.48, which is $2,879.52 less than the agreed-settlement amount. As a result, the underlying debt remains outstanding and a balance is due and payable. On these undisputed facts alone, Green Tree is entitled to summary judgment.

That the settlement agreement contains a typographical error as to the amount of the monthly installment payments does not reduce Plaintiff's payment obligations nor does it defeat summary judgment in favor of Green Tree. As discussed above, the existence of a scrivener's error or ambiguity in the agreement allows this Court to consider extrinsic evidence to ascertain the parties' true intent. Doing so here leaves no genuine dispute that the parties agreed to settle for 50% of the principal balance owed on the underlying debt (or $21,136.00) payable with an initial installment of $2,500 and $18,636.00 payable in forty-eight (48) monthly payments of $388.26.

The written communications between Plaintiff and Mr. Epps (Exs. 7-8) as well as those between Plaintiff's attorney, Mr. Jacks, and Mr. Epps (Exs. 10-13) conclusively demonstrate that the agreement

14

was always for $21,136.00 to be paid by a down payment of $2,500 and monthly payments of $388.26 for forty-eight (48) months. Every letter and email exchanged between the parties leading up to the settlement specified $388.26 as the monthly installment amount. The deposition testimony of Mr. Epps and Mr. Jacks likewise confirm the amount of the monthly installments to be $388.26. Ex. 5, Epps Depo. at 93:14-94:11, 95:8-24, and Ex. 6, Jacks Depo. at 13:10-18, 14:22-15:13, 37:2-7, 38:13-17.

The only reference to $328.26 as the monthly installment amount appears in the settlement agreement, and according to Mr. Epps and Mr. Jacks (the two individuals who negotiated the terms of the settlement) that is a mistake. Ex. 5, Epps Depo. at 93:14-94:11; Ex. 6, Jacks Depo. at 14:22-15:13. It would be nonsensical for the parties to include a monthly installment amount which would not allow the $18,636.00 due under paragraph 2(b) of the agreement to be paid in forty-eight (48) months or when combined with the initial payment of $2,500 not equal the settlement amount of $21,136.00 defined in paragraph 1 of the agreement. As Plaintiff's own payment history shows, forty-eight (48) payments of $326.26 equals $15,756.48, and when this amount is added to the initial payment of $2,500.00, the total amount paid is only $18,256.48. However, if the Court were to reform the settlement agreement to reflect the parties' actual intent for the monthly installment amount to be $388.26, the math works (albeit off by $.48). Forty-eight (48) payments of $388.26 total $18,636.48, which when added to the initial payment of $2,500.00 equals the agreed-upon settlement amount of $21,136.48.

### 4. Reformation Of The Settlement Agreement Compels The Entry Of Summary Judgment In Favor Of Green Tree And Against Plaintiff.

Reformation of the settlement agreement to reflect a monthly installment amount of $388.26, rather than $328.26, is fatal to Plaintiff's claims against Green Tree. As Plaintiff concedes, he made forty-eight (48) installment payments in the amount of $328.26 and as a result, his payments total only $18,256.48, which is $2,879.52 *less* than the undisputed "settlement amount" agreed to in paragraph 1 of

15

the agreement.  Consequently, the debt remains outstanding and a balance is due and payable.[7]  Green

Tree's alleged reporting of the debt as outstanding is therefore true and accurate and entitles Green

Tree to summary judgment on Plaintiff's FCRA claim.[8] *Henderson v. GMAC Mortg. Corp.*, Case No. C05-

5781RBL, U.S. Dist. LEXIS 29329, at ** 21-22 (W.D. Wash. Apr. 10, 2008) (granting summary

judgment in favor of loan servicer where plaintiffs claimed that servicer reported negative information to

CRAs because plaintiffs failed to establish that servicer reported inaccurate information and concluding

that servicer "rightfully furnished information to the [CRAs] after the Plaintiffs fell three months behind

on their monthly mortgage payments").  Likewise, Green Tree's collection efforts do not constitute a

breach of the settlement agreement.   To the contrary, it is Plaintiff who breached the settlement

agreement and it is Plaintiff who remains indebted under the promissory note.

---

[7] Plaintiff owes more than just the $2,879.52 short-fall. Because Plaintiff defaulted in making installment payments that equal the settlement amount of $21,136.00, he is now liable for the "remaining balance of the indebtedness" which includes the $2,879.52 short-fall plus the 50% of the full indebtedness that was to be forgiven upon payment of the "settlement amount." Ex. 4, Settlement Agreement, ¶ 6 ( providing that "a default in the making of any installment payment of the settlement amount" renders the settlement "null and void and in such event all payments made pursuant to this Agreement prior to the default shall be applied to the indebtedness and Borrower shall remain liable for the remaining balance of the indebtedness . . ."). This amount is immediately due and payable. *Id.*

[8] Plaintiff alleges both willful and negligent violations of § 1681s-2(b). FAC, ¶ 41. A willful violation allows a plaintiff to pursue punitive as well as statutory damages whereas a negligent violation requires actual injury. 15 U.S.C. §§ 1681n & 1681o. Absent actual injury, a claim for negligent violation of the FCRA fails. *See Morse v. USAA Fed. Sav. Bank*, No. 12-CV-381, 2012 WL 6020090, at *3 (D. Nev. Dec. 3, 2012) ("[A]ctual damages . . . are a required element" of a claim for negligent violation of § 1681s-2(b)); *Buechler v. Keyco, Inc.*, No. 09-CV-2948, 2010 WL 1664226, at *2 (D. Md. Apr. 22, 2010) ("[Plaintiff] [did] not allege actual damages; to recover, he must prove that [defendant's] violation of [the FCRA] was willful."). Accordingly, Green Tree is entitled to summary judgment on Plaintiff's negligent FCRA claim for the additional reason that his actual damages are speculative and without any evidentiary support. In support, Green Tree adopts and incorporates by reference the argument in co-defendant M. Richard Epps' Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment and in support of Cross-Motion for Summary Judgment (Doc. 92-1) at 23-27.

## CONCLUSION

There being no dispute of material fact, Green Tree is entitled to summary judgment on Plaintiff's claims under the FCRA and for breach of contract as alleged in Counts II and II of the First Amended Complaint.

Respectfully submitted,

_____/s/_____

Brian L. Moffet (Fed. Bar No. 13821)
Zachary S. Schultz (Fed. Bar No. 03927)
Miles & Stockbridge P.C.
100 Light Street
Baltimore, MD 21202
Tel: (410) 385-3656
Fax: (410) 773-9031
Email: bmoffet@milesstockbridge.com
           zschultz@milesstockbridge.com
*Attorneys for Ditech Financial, LLC, f/k/a*
*Green Tree Servicing, LLC*

17